UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
Rosy Gelin,

                     Plaintiff,

        -against-

The City of New York, New York City
Department of Homeless Services, et al.

                  Defendants.
-------------------------------------------------------X

NOT FOR PUBLICATION
**ORDER TO SHOW CAUSE**
10-cv-5592 (CBA) (VVP)

**AMON, Chief United States District Judge**.

## INTRODUCTION

Plaintiff Rosy Gelin brings this action against defendants the City of New York, New York City Department of Homeless Services, Fran Winter, George Nashak, and Douglas James alleging retaliation in violation of the First Amendment and employment discrimination, retaliation, and hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.; 42 U.S.C. § 1981; New York State Executive Law § 296 ("New York State Human Rights Law" or "NYSHRL"); and New York City Administrative Code § 8-107 *et seq.* ("New York City Human Rights Law" or "NYCHRL").[1]  Before the Court is defendants' motion for summary judgment as to all claims.  For the reasons set forth below, the motion is granted in its entirety.

## BACKGROUND

Gelin, an African-American female, began working at the New York City Department of Homeless Services ("DHS") in 2001.  (Pl. 56.1 ¶¶ 1-2; Def. 56.1 ¶¶ 1-2.)  In 2005, she received the position of Director of DHS's Adult Family Intake Center ("AFIC"), the DHS unit

---

[1] In her memorandum of law in opposition to defendants' motion for summary judgment, Gelin withdrew her previously-asserted claims under New York Civil Service Law § 75-b and New York Labor Law § 740; her § 1983 *Monell* claim; and her claim for common law intentional infliction of emotional distress.  (Pl. Mem. in Opp. at 6.)

responsible for processing temporary housing applications by homeless adults who consider themselves a family unit but do not have minor children. (Pl. 56.1 ¶ 3, Def. 56.1 ¶ 3.)  DHS is divided into two main divisions, the Adults Division and the Families with Children Division. At the time Gelin joined AFIC, the unit was part of the Families with Children Division. (Pl. 56.1 ¶¶ 5, 40; Def. 56.1 ¶¶ 5, 40.)

As Director of AFIC, Gelin attended regularly-scheduled monthly meetings with her superiors, including defendant Fran Winter, the First Deputy Commissioner of DHS.  (Pl. 56.1 ¶¶ 12, 18, 22; Def. 56.1 ¶¶ 12, 18, 22.)  At these meetings, Gelin would update her superiors on the AFIC unit's monthly shelter placement eligibility data, including the number of housing applicants processed by the AFIC unit during the prior month, the number of those applicants held eligible for temporary housing, and any explanation for changes or trends in those statistics. (Pl. 56.1 ¶¶ 18-21; Def. 56.1 ¶¶ 18-21.)

During the October 2008 meeting, Gelin reported that AFIC's eligibility numbers had been increasing since the summer of 2008. (Pl. 56.1 ¶ 26, Def. 56.1 ¶ 26.)  Winter and other attendees expressed concern about this trend and asked Gelin for an explanation. (Pl. 56.1 ¶¶ 25-28; Def. 56.1 ¶¶ 25-28.)  Notwithstanding Gelin's response that the numbers could have been increasing because of the onset of the recession, Gelin's superiors requested that she provide a report breaking down the "exact numbers." (Pl. 56.1 ¶¶ 33-35; Def. 56.1 ¶¶ 33-35.)  At the November 2008 meeting, Gelin presented a report based on an audit of all eligible AFIC families which categorized each family by its prior housing situation and explained AFIC's eligibility determinations.  (Pl. 56.1 ¶¶ 36-37; Def. 56.1 ¶¶ 36-37.)  The meeting attendees, including Winter,[2] had no questions about the presentation.  (Pl. 56.1 ¶ 38, Def. 56.1 ¶ 38.) Gelin claims

---

[2] Neither George Nashak nor Douglas James, the other two individually named defendants in this action, were present at these meetings.  (Pl. 56.1 ¶¶ 23-24; Def. 56.1 ¶¶ 23-24.)

that Winter "completely ignored" her report, which, she claims, indicates that Winter was "only concerned with minimizing the number of eligible applicants." (Pl. 56.1 ¶¶ 27, 28, 30, 34, 38.)

In early 2009, the entire AFIC unit was moved from the Families with Children Division to the Adults Division of DHS.  (Pl. 56.1 ¶¶ 5, 40; Def. 56.1 ¶¶ 5, 40.)  The parties dispute the reason for this move.  According to defendants, the move was made for strategic reasons, because "the clients served by the adult family division were more similar to the single adult homeless people that [DHS] served," in that they were "more likely to experience mental health issues and substance abuse issues than the families being served in the families with children division." (Nashak Dep. at 25-26; Def. 56.1 ¶ 41.)  Gelin contends that the timing of the move— occurring shortly after the October and November 2008 meetings—indicates that the move was intended to target Gelin for "not yielding to the pressure to minimize the number of eligible applicants for temporary housing."  (Pl. 56.1 ¶ 41.)  The parties do not dispute that the move was a lateral transfer for Gelin and the rest of the AFIC unit, changing only the chain of command above Gelin.  (Pl. 56.1 ¶ 42; Def. 56.1 ¶ 42.)  Gelin began reporting to defendant George Nashak, then Deputy Commissioner for Adult Services. (Pl. 56.1 ¶¶ 6-8, 43; Def. 56.1 ¶¶ 6-8, 43.)  Her direct supervisor became Caucasian female Mary Hall.  (Pl. 56.1 ¶ 43; Def. 56.1 ¶ 43.)

Gelin claims that after the move to the Adults Division, Nashak also placed pressure on her to lower eligibility rates. (Pl. 56.1 ¶ 44.) Gelin concedes, however, that no DHS supervisor ever expressly asked her to lower her eligibility numbers. (Pl. 56.1 ¶¶ 28, 30.)  Gelin also claims that at some point, presumably after the move, she complained to Hall that at least one Caucasian family applying for housing eligibility was not required to submit the same documentation as a minority family before being placed in a shelter.  (Pl. 56.1 ¶ 70; Gelin Dep. at 150-51.)

3

In September 2009, the New York City Department of Investigation forwarded an anonymous complaint to DHS's General Counsel alleging that an AFIC Community Associate named Wandaliz Rodriguez had been falsifying timesheets over a period of two to three years and that her supervisors, including Gelin, permitted this misconduct.  (Pl. 56.1 ¶¶ 46-47; Def. 56.1 ¶¶ 46-47.)  In early October 2009, African-American female Audrey Belton, another AFIC Community Associate, filed a separate complaint of discrimination against Gelin with DHS' Office of Equal Opportunity Affairs ("EOA").  This complaint alleged that Gelin and other supervisors treated Belton differently from the other Hispanic Community Associates on her shift—including Wandaliz Rodriguez—by denying her sick leave, accusing her of excessive leave usage, and creating a hostile work environment.  (Pl. 56.1 ¶ 48; Def. 56.1 ¶ 48.)  Upon the EOA's commencement of an investigation of Belton's complaint, the Ethics and Employment Unit ("EEU") within DHS' Office of Legal Affairs launched its own disciplinary investigation of potential misconduct at AFIC.  (Pl. 56.1 ¶¶ 49-50; Def. 56.1 ¶¶ 49-50.)  Throughout the course of the investigations, Nashak, Winter, and defendant Douglas James, DHS's Deputy General Counsel for Programs and External Affairs, met on several occasions to review the findings of both investigations and make disciplinary recommendations. (Pl. 56.1 ¶ 59; Def. 56.1 ¶ 59.)

As a result of the complaints and investigations, morale was low at the AFIC unit and Nashak determined that "new leadership was required." (Pl. 56.1 ¶ 61, Def. 56.1 ¶ 61.)  In February 2010, Nashak, Winter, and James transferred Gelin to the position of Acting Program Administrator in DHS's main office.  (Pl. 56.1 ¶ 62; Def. 56.1 ¶ 62.)  Despite the transfer, Gelin continued to report directly to Hall and her compensation remained the same. (Pl. 56.1 ¶ 65; Def. 56.1 ¶ 65.)  Sometime in 2010, Gelin complained to Hall that as Acting Program Administrator, she was required to perform the increased duties of permanent Program Administrators without

4

receiving the title, commensurate compensation, or access to a vehicle; however, she did not make a complaint about this to the EOA. (Pl. 56.1 ¶¶ 68, 72; Def. 56.1 ¶ 68, 72.)

After the EOA and EEU investigations concluded, Nashak, Winter, and James recommended a series of disciplinary actions for those involved based on the investigations' findings.  This included demotion of Gelin to her underlying civil service title of Associate Fraud Investigator Level 1 and termination of Rodriguez. (Pl. 56.1 ¶¶ 74-78; Def. 56.1 ¶¶ 74-78.) On June 14, 2010, James and Hall met with Gelin and gave her a letter from the EEU notifying her of the demotion. (Pl. 56.1 ¶ 79; Def. 56.1 ¶ 79.)  The letter indicated that Gelin was being demoted due to EEU and EOA findings of misconduct; specifically, the EEU's finding that Gelin "improperly discharged [her] duties during [her] tenure as the Director of AFIC in that [she] permitted and enabled Ms. Rodriguez's misconduct," and the EOA's finding that Gelin "permitted discriminatory treatment of other Community Associates who were not of Hispanic heritage and gave an unfair advantage to Ms. Rodriguez with respect to time and leave approvals, performance evaluations, and assignments." (McNally Dec., ex. I; Cronin Dec., ex. C.)  Gelin denies that she discriminated against Belton or that she engaged in misconduct related to Rodriguez.  (Pl. 56.1 ¶¶ 45, 47-48, 53-54, 56-58.)

On or about July 2010, Gelin filed a charge of discrimination with the EEOC, and received a right to sue letter on September 3, 2010.  (Am. Compl. ¶ 13, Cronin Dec., ex. M.) This action was commenced on December 2, 2010.

## DISCUSSION

*I. Standard of Review*

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). The court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The court is required to view the evidence in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Nevertheless, the non-moving party cannot rest on mere allegations or denials but must instead set forth specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Nat'l Westminster Bank USA v. Ross*, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact."). No genuine issue exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).

In discrimination cases, courts must be mindful that "[a] victim of discrimination is . . . seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991). Nevertheless, the Second Circuit has recognized that "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

## II. First Amendment Retaliation

Plaintiff raises two instances of constitutionally-protected speech for which she claims to have suffered retaliation in violation of the First Amendment.  First, she claims that she suffered

retaliation for complaining to Hall about a Caucasian family receiving housing placement without having to submit the same documentation as a minority family. (Pl. Mem in Opp. at 9.) Second, she claims that during the October and November 2008 monthly meetings attended by Winter, she challenged what she alleges to be pressure by her superiors to artificially decrease the number of applicants deemed eligible for temporary housing. Gelin claims generally that she made statements to the effect that all applicants who met eligibility criteria should be granted eligibility, but does not identify any particular statement made. (*Id.*) Gelin claims that her demotion in June 2010, her transfer to the position of Acting Program Administrator in February 2010, and apparently the move of the entire AFIC unit to DHS's Adults Division in early 2009 were each taken in retaliation for these actions. (*Id.* at 10.) Gelin also contends that she was subjected to heightened scrutiny because at a meeting in May 2010, Nashak ordered Bill DiStefano—the individual who replaced Gelin as Director of AFIC—to review AFIC's eligibility determinations from early 2010 while Gelin was still Director of AFIC. (*Id.* at 16.)

Defendants argue that Gelin's First Amendment retaliation claims must be dismissed as a matter of law because she did not engage in speech or activity subject to First Amendment protection. Defendants additionally argue that even if the Court were to find that Gelin engaged in a protected activity, she has failed to establish that any adverse employment action was even partly motivated by that activity. (Def. Mem. at 4-14.) The individual defendants also assert that they are shielded from liability under the doctrine of qualified immunity. (*Id.* at 14.) For the reasons set forth below, Gelin did not engage in any speech or activity protected by the First Amendment and so her First Amendment retaliation claim must fail.

### A. *Constitutionally Protected Activity*

A public employee's speech is entitled to First Amendment protection only if "the employee

spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

A "matter of public concern" is one that involves a "political, social, or other concern to the

community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).  When a public employee speaks

"pursuant to [her] official duties" instead of as a citizen, she is not afforded protection under the

First Amendment, "even when the subject of [the] employee's speech is a matter of public

concern." *Looney v. Black*, 702 F.3d 701, 710 (2d Cir. 2012).

    The threshold inquiry, then, is whether any of Gelin's statements or actions were made as a

citizen. "[W]here the speech at issue 'owes its existence to a public employee's professional

responsibilities,' it can properly be said to have been made pursuant to that party's official

duties." *Id.* at 710-11 (quoting *Garcetti*, 547 U.S. at 421-22) (internal citation omitted).  In this

Circuit, "speech can be 'pursuant to' a public employee's official job duties even though it is not

required by, or included in, the employee's job description, or in response to a request by the

employer." *Weintraub v. Bd. of Educ. of City Sch. Dist. of New York City*, 593 F.3d 196, 203 (2d

Cir. 2010).  A complaint or grievance made "in furtherance of the execution of one of [the

plaintiff's] core duties" will generally be considered "pursuant to" the plaintiff's official duties.

*Id.*  Moreover, where the speech at issue is made in a "form or channel of discourse" that is not

available to non-employee citizens and thus "lack[s] a relevant analogue to citizen speech"—for

example, an internal communication made directly to supervisors—the speech will be considered

"pursuant to" the public employee's official duties and not entitled to protection.  *Id.* at 204.

    None of Gelin's alleged complaints, statements, or actions were made in her capacity as a

citizen, and thus none are entitled to First Amendment protection.  Defendants contend that

Gelin's complaint to Hall about a Caucasian family receiving favorable treatment was limited to

Gelin's concern that one particular white family was automatically placed in housing without

going through the normal intake process.[3]  Defendants also note that Gelin testified that she did

not indicate to Hall that this was racially discriminatory.  (Def. Reply at 4 (citing Gelin Dep. at

152).)  Gelin contends that she sufficiently linked this complaint to race by complaining that it

was unfair that the Caucasian family received preferential treatment over a minority family.

(Gelin Dep. at 150.)  Even assuming that this complaint involved a matter of public concern,

however, it still was not protected activity because it was unquestionably made pursuant to

Gelin's official duties.   As Director of AFIC, Gelin's job description expressly included

"ensur[ing]…that eligibility determinations are rendered in a fair and impartial manner."  (Pl.

56.1 ¶ 4; Def. 56.1 ¶ 4.)    Moreover, as an internal communication made directly to her

supervisor, this complaint lies squarely within the "form or channel of discourse" lacking a

citizen analogue and thus cannot be considered citizen speech.  *Weintraub*, 593 F.3d at 204.

Gelin also claims that unidentified statements made during the October and November 2008

monthly meetings challenging defendants' alleged pressure to "lower the eligibility rate at any

cost" were made as a "concerned citizen." (Pl. Mem. in Opp. at 9-10.)  Even assuming that Gelin

did make statements at the October and November 2008 meetings challenging what she at least

perceived to be unlawful pressure, any such speech cannot be considered protected activity under

the First Amendment.  Contrary to Gelin's argument that it was not part of her "job to raise the

issue," (*id.* at 9), Gelin's Director of AFIC job description specifically encompassed "ensur[ing]

appropriate eligibility recommendations are made," ensuring "compliance with eligibility

guidelines," and "conduct[ing] management quality assurance audits of operations, methods and

processes to ensure that implemented AFIC standards established to prevent erroneous eligibility

recommendations are followed." (Pl. 56.1 ¶ 4; Def. 56.1 ¶ 4.)  The monthly meetings were held

---

[3] It is not clear from the record when Gelin made this complaint to Hall.  However, as Hall did not become Gelin's direct supervisor until March 2009, the Court presumes that this complaint occurred sometime thereafter. (Pl. 56.1 ¶ 43; Def. 56.1 ¶ 43; Gelin Dep. at 150-152.)

for the purpose of reviewing and explaining trends in eligibility rates.  (Pl. 56.1 ¶¶ 18-21; Def. 56.1 ¶¶ 18-21.)  It was thus precisely Gelin's job to respond to any questions and concerns regarding housing eligibility rates, as well as to ensure that all truly eligible temporary housing applicants received housing eligibility.  Such discourse with superiors at a regularly scheduled internal meeting is the sort of communication channel available only to public employees, not citizens.  *Weintraub*, 593 F.3d at 204.  Any statements made by Gelin at these meetings, including Gelin's presentation of the report requested by her superiors breaking down the precise eligibility numbers, were made pursuant to Gelin's official duties.

Gelin has not established that she engaged in any constitutionally-protected activity.  As such, the Court need not consider whether plaintiff has shown a causal connection between her speech and any adverse employee action, nor must the Court determine whether the individual defendants are entitled to qualified immunity.  Summary judgment on the First Amendment retaliation claim is granted.

### III. Employment Discrimination under Federal and New York State Statutes[4]

Gelin's claims for violations of Title VII, 42 U.S.C. § 1981, and the NYSHRL rest on three theories: discriminatory treatment, retaliation, and hostile work environment.  Each of these claims must be dismissed because Gelin has failed to link any adverse action to a discriminatory or retaliatory intent.

#### A. Discriminatory Treatment

Gelin claims that she suffered discriminatory treatment in that (1) she was transferred to the position of Acting Program Administrator in February 2010 because she is African-American and a woman; and (2) she was demoted three levels from the position of Acting Program

---

[4] The NYCHRL, as amended in 2005, is not coextensive with the federal and state statutes and requires an "independent analysis."  *Mihalik v. Credit Agricole Cheuvreux N. America, Inc.*, --F.3d--, 2013 WL 1776643, at *4 (2d Cir. Apr. 26, 2013).  Consequently, the Court addresses Gelin's NYCHRL claims separately, *see* Part IV, *infra*.

Administrator to the civil service title of Associate Fraud Investigator Level 1 in June 2010 because she is African-American and a woman. (Pl. Mem. in Opp. at 12.)  Whether asserted under Title VII, § 1981, or the NYSHRL, claims alleging discriminatory treatment are analyzed under the same framework and according to the same basic standards. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (noting the standards are the same under Title VII, § 1981, and the NYSHRL).

Claims for discriminatory treatment are analyzed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, the plaintiff must establish a *prima facie* case for discrimination.  *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  To state a *prima facie* case, a plaintiff must establish that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *Id.* at 491-92.  "Once a plaintiff meets this initial burden, the burden then shifts to the defendant to offer a legitimate nondiscriminatory reason" for its actions. *Id.* at 492.  If the defendant carries its burden at this second step, the plaintiff must "demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 499 (2d Cir. 2009) (internal quotation marks omitted), *superseded on other grounds by N.Y.C. Local L. No. 85*; *see also United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011). Importantly, simply showing that defendants' proffered justification was pretextual does not suffice to carry the plaintiff's burden at this third step; rather, "to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not

based in whole or in part on discrimination." *Aulicino v. New York City Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (internal quotation marks and ellipses omitted).

Given the difficulty of proving that discriminatory intent motivated the defendant's conduct, a plaintiff can raise an "inference of discrimination" by showing that she was treated "less favorably than a similarly situated employee outside [her] protected group." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)); *see also Malcolm v. Honeoye Falls Lima Cent. Sch. Dist.*, 483 F. App'x 660, 662 (2d Cir. 2012). An employee is similarly situated to co-employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." *Ruiz*, 609 F.3d at 493-94 (quoting *Graham*, 230 F.3d at 40). Under this so-called "comparator test," there must be "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." *Id.* (quotation marks omitted). Put otherwise, the plaintiff must be "similarly situated" to the comparator "in all material respects" but for membership in the protected group. *Id.*

Gelin has failed to make out a *prima facie* case of discrimination. Even assuming (without deciding) that she was qualified for the position of Director of AFIC and that both her transfer to the position of Acting Program Administrator and her demotion were adverse employment actions, she has failed to raise an inference of discrimination related to either action. Gelin attempts to establish race, color, and gender discrimination by citing the allegedly preferential treatment of Caucasians Mary Hall and Bill DiStefano. This attempt fails because neither Hall nor DiStefano is a similarly-situated comparator.

In 2005, Hall lost 21 vacation days for knowingly submitting one falsely-dated agency report, a violation that Hall admitted. (McNally Dec., ex. O.) In contrast, the EEU investigation

12

found that Gelin "circumvented agency procedure and created a temporary compressed schedule for C.A. Rodriguez on [sic] December of 2007 without submitting for an approved leave" and despite findings that such a schedule must be union negotiated, (*id.*, ex. M), that Gelin approved Rodriguez's false time sheets, (*id.*), and that Gelin "put blame on her subordinate supervisors for her actions," (*id.*).  The EOA investigation found that Gelin engaged in discriminatory conduct against Audrey Belton with respect to approval of leave time, (*id.*, ex. L), that she allowed Rodriguez to work an unofficial modified schedule, (*id.* at 8), and that she "admitted to not reaching out to available DHS offices…for guidance, assistance with, or monitoring Ms. Rodriguez's situation and requests," (*id.*).  Hall's single instance of misconduct is simply not comparable to the misconduct found substantiated against Gelin, so any comparison with her is irrelevant.  *Ruiz*, 609 F.3d at 493-94.[5]

The fact that Gelin was replaced by DiStefano as Director of AFIC similarly does not suffice to raise an inference of gender discrimination.  Aside from Gelin's own deposition testimony based upon inadmissible hearsay that DHS was not satisfied with DiStefano's performance, (Gelin Dep. at 113-14), Gelin has offered no evidence to substantiate her allegation that DiStefano was less qualified for the position of Director of AFIC than Gelin.  On the contrary, Nashak testified that DiStefano was brought to AFIC when it was moved to the Adults Division

---

[5] Gelin contends that the EOA and EEU's findings of misconduct with respect to Rodriguez are inaccurate because she requested and submitted the proper documentation for Rodriguez's schedule.  To support this, she cites to her own deposition testimony that Rodriguez approached her in September 2008 about receiving a modified schedule to take care of her ill son and that Rodriguez provided doctors' notes to support this request.  (Gelin Dep. at 218, 221-22.)  Gelin additionally cites two e-mails indicating that in September 2009, Rodriguez requested two weeks of medical leave because she was scheduled to have surgery, that Gelin directed her to submit a Family and Medical Leave Act ("FMLA") package, and that Gelin forwarded the FMLA package to her personnel liaison in October 2009.  (Cronin Dec. exs. H, I.)  Gelin provides no evidence aside from her own conclusory assertions that as a manager, she had discretion to permit a modified schedule merely upon receipt of doctors' notes or similar documentation.  Moreover, the e-mails regarding leave in September and October 2009 do nothing to contradict the findings that Gelin failed to obtain proper approvals for Rodriguez's modified schedule for 1-2 years.  The Court finds that this evidence does not suffice to establish that Gelin provided proper documentation for Rodriguez's modified schedule.  More to the point, she makes no showing that it was unreasonable for defendants to rely on the findings of two independent investigations in making their disciplinary determinations.

because DiStefano is a licensed social worker, and the Division wanted to "raise [their] clinical firepower to be able to address [mental health and substance abuse] issues correctly." (Nashak Dep. at 109-110.)  Moreover, in an e-mail from Hall to Gelin announcing DiStefano's transfer to AFIC, Hall states that DiStefano "is a seasoned professional who brings a wealth of program experience with him."  (Cronin Dec., ex. K.)[6]  Gelin has provided no substantiation for her assertion that defendants "wanted to unfairly remove" her in order to replace her with DiStefano, (Pl. 56.1 ¶ 62), and the simple fact that DiStefano is male is insufficient to carry Gelin's burden of establishing gender-based discriminatory intent.

Finally, with respect to the February 2010 transfer in particular, it is undisputed that three African-American females, one Hispanic female, and one Caucasian female held the title of permanent Program Administrator, but not any males.  (Pl. 56.1 ¶ 67; Def. 56.1 ¶ 67.)  The fact that three African-American females held this position undermines any claim that Gelin was denied the full benefits of the permanent position due to her race, color, or gender.

Gelin has failed to establish a *prima facie* case of race discrimination related to her transfer and demotion. Even if she had, however, defendants' claims of low morale at AFIC under Gelin's leadership and the EOA and EEU findings of misconduct suffice to discharge defendants' burden to proffer legitimate, non-discriminatory reasons for her transfer and demotion. At step 3 of the analysis, Gelin then bears the ultimate burden of proving that this reason was a pretext for discrimination.  Despite Gelin's conclusory arguments that the EOA and EEU investigations were poorly conducted and their findings inaccurate, she has not shown that defendants did not actually and reasonably rely on the investigation results in deciding to demote her, nor has she provided any other evidence that her transfer and demotion were "more likely

---

[6] The Court notes that this e-mail is dated August 12, 2009, but states that DiStefano's official start date with AFIC "will be . . . on June 22nd."  (Cronin Dec., ex. K.)  Given that DiStefano replaced Gelin as Acting Director of AFIC as of February 2010, (*id.*, ex. L), the Court assumes that one of the dates in this exhibit is inaccurate.

than not" the product of discriminatory animus, *Aulicino*, 580 F.3d at 80; *Leibowitz*, 584 F.3d at 504.[7] Summary judgment on Gelin's race, color, and gender discrimination claims is granted.

## B. Retaliation

Gelin also alleges that defendants retaliated against her in violation of Title VII, § 1981, and the NYSHRL. The *McDonnell Douglas* burden-shifting analysis applies to claims of retaliation under each of these statutes. *See Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 568 n. 6 (2d Cir. 2011); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720, 723 (2d Cir. 2010). The Court analyzes Gelin's federal and state retaliation claims together.

To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in a protected activity by opposing a practice made unlawful by Title VII (or other relevant statute); (2) her employer was aware of that activity; (3) she suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Tepperwien*, 663 F.3d at 568 & n. 6 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). The burden then shifts to the employer to proffer a legitimate, nondiscriminatory reason for its actions. *Id.* If the employer carries this burden, the burden shifts back to the employee to prove that retaliation was a substantial reason for the adverse action. *Id.*

---

[7] Gelin identifies two female minority employees, Maria Rodriguez, a Hispanic, and Roxanne Edwards, an African-American, who she claims were "also transferred to the main office due to EEO [i.e., EOA] violation." (Cronin Dec., ex. B.) Gelin claims in her brief that the fact that these women were also transferred "shows that minorities were subjected to stricter scrutiny if they disagreed with the management, and, consequently, they suffered greater penalties if they were found to have violated the management's 'rules.'" (Pl. Mem. in Opp. at 15.) However, the only evidence offered in support of her claim that minorities received harsher discipline is an e-mail sent by Gelin to counsel on November 8, 2010, apparently in preparation for filing the instant action. (Cronin Dec., ex. B.) This e-mail does not indicate anything about the EOA violations allegedly committed by these women, but does reveal that, unlike Gelin, neither employee was demoted after the EOA finding. (*Id.*) This undermines any claim that she received harsher discipline because of her race or color.

Gelin's retaliation claim fails because none of the activities she previously identified to support her claims of retaliation are protected, and the one complaint she now makes that constitutes protected activity is not causally connected to any of the adverse employment actions she raises.

For the purposes of her retaliation claim, Gelin's allegations of protected activity have shifted throughout the course of this litigation.[8]  In her amended complaint and her memorandum of law, Gelin claimed that she engaged in protected activity by complaining to Hall sometime in 2010 *about her transfer to the position of Acting Program Administrator*.  (Am. Compl. ¶ 23; Pl. Mem. in Opp. at 15 (citing to the portion of Gelin's deposition discussing her complaint about this transfer).)  To the extent that Gelin is still pressing this complaint as part of her retaliation claim, it fails because she did not link this complaint to discrimination.  Gelin conceded at her deposition that although she complained to Hall that she was doing the job of a permanent Program Administrator without being compensated for it and without having access to a vehicle, she complained only that this was "unfair" and did not specifically complain about discrimination.  (Gelin Dep. at 109.)  Gelin further testified that she never made a formal complaint to EOA.  (*Id.* at 110.)  As "[t]he onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally," this complaint fails to constitute protected activity. *Aspilaire v. Wyeth Pharmaceuticals, Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009); *Filippi v. Elmont Union Free Sch. Dist. Bd. of Educ.*, No. 09-cv-4675 (JFB),

---

[8] In her amended complaint, Gelin alleged that she engaged in protected activity by supporting a complaint circulated in 2003 alleging that two African-American Assistant Commissioners at DHS were paid less than a Caucasian Assistant Commissioner.  (Am. Compl. ¶ 16.)  At her deposition, Gelin admitted that this allegation was "incorrectly stated," and that she was merely "aware" of this complaint but "did not support" it.  (Def. Mem. at 34, Gelin Dep. at 57-59.)  Gelin's counsel clarified at oral argument that she is no longer claiming to have engaged in protected activity related to this complaint.

2012 WL 4483046, at *16 (E.D.N.Y. Sept. 27, 2012) ("Mere complaints of unfair treatment by an individual are not protected speech under Title VII." (quotation marks omitted)).

Gelin also raises in the statutory retaliation section of her memorandum of law the October and November 2008 meetings and her contention that she refused to "yield" to defendants' allegedly illegal pressure to artificially decrease eligibility rates. (Pl. Mem. in Opp. at 15-17.) But as is true with much of Gelin's brief, it is not clear to what end this argument is made.  If she means to assert this as protected activity that subjected her to retaliation, this too fails since there is no link between decreased eligibility rates and discrimination made unlawful by Title VII, § 1981, or the NYSHRL.  Gelin has never asserted that defendants pressured her to decrease eligibility rates among any particular protected group, and she has not otherwise established that this alleged pressure was in any way discriminatory or proscribed by the relevant statutes.  In any event, the record does not support Gelin's contention that defendants pressured her to artificially reduce eligibility rates.  Gelin's unreasonable assumption that defendants' questioning somehow equates to an unlawful employment practice is unavailing.  *Cf. Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002); *Galdieri-Ambrosini*, 136 F.3d at 292.[9]

At oral argument, Gelin changed course and argued that the protected activity that is the subject of her retaliation claim is her complaint to Hall about a Caucasian family receiving preferential treatment upon intake.  She had not previously identified this complaint as protected activity for purposes of her *statutory* retaliation claims.  This complaint was advanced instead in

---

[9] Gelin claims that Nashak's May 2010 decision to have DiStefano review AFIC eligibility decisions from early 2010 when she was Director "shows the disparate treatment, as plaintiff was singled-out and her decisions were being questioned, even though they were made pursuant to her legitimate managerial discretion." (Pl. Mem. in Opp. at 16.)  Even if Gelin was singled out, she has offered no evidence to suggest that she was singled out because of her race, color, gender, or protected activity.  On the contrary, based on Gelin's own testimony, it appears that Nashak asked DiStefano to review these eligibility determinations because he was specifically concerned that 7 percent of AFIC housing applicants who had been denied eligibility were successful on appeal.  (Gelin Dep. at 86-87.)  This suggests that, if anything, Nashak felt Gelin had improperly *denied* eligibility to deserving applicants, not that he was retaliating against her for *granting* eligibility to too many applicants.

support of her First Amendment retaliation claim.  Even if a statutory retaliation claim were properly pled based upon this protected activity, it fails for lack of a causal connection.  Gelin has not offered a shred of evidence that any of the adverse employment actions she alleges—including this transfer, her demotion, and Nashak's direction to DiStefano to review AFIC's early 2010 eligibility determinations—had anything to do with the complaint about the Caucasian family receiving preferential treatment.  Nothing in the record establishes the date that she made this complaint, let alone that Nashak, Winter, or James were ever aware of it.  (*See* Pl. Mem. in Opp. at 9-10; Gelin Dep. at 150-52.)  There is no evidence in the record, direct or circumstantial, connecting this complaint and the alleged adverse actions.

Summary judgment on Gelin's federal and state statutory retaliation claims is granted.

*C. Hostile Work Environment*

Gelin also alleges that she suffered a hostile work environment in violation of Title VII, § 1981, and the NYSHRL. To establish the existence of a hostile work environment under these statutes, a plaintiff must prove that, based on the totality of the circumstances, the "workplace [wa]s permeated with discriminatory intimidation, ridicule, and insult…that [wa]s sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).[10] Generally, the plaintiff must "show more than a few isolated incidents of racial [or gender] enmity." *Fincher*, 604 F.3d at 724.  It is "axiomatic" that to sustain a hostile work environment claim, the "plaintiff must demonstrate that the conduct occurred *because of*" her gender or race.  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (emphasis added).  To sustain a claim of retaliatory hostile work environment, the plaintiff must satisfy the

---

[10] *See Patterson v. County of Oneida*, 375 F.3d 206, 227 (2d Cir. 2004) (applying Title VII standard under § 1981); *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 424-25 (E.D.N.Y. 2012) (applying same under NYSHRL).

same rigorous standard governing class-based hostile work environment claims.  *See Zhengfang Liang v. Café Spice SB, Inc.*, --F. Supp. 2d--, No. 08-cv-1306 (JFB) (ETB), 2012 WL 5988766, at *18 (E.D.N.Y. Nov. 29, 2012) (collecting cases).

Gelin argues that she suffered a hostile work environment because (1) after her demotion, other employees "laughed at plaintiff, taunted her, and even questioned her competence," (Gelin Dep. at 179); (2) Nashak yelled during a meeting attended by Gelin, DiStefano, and an Hispanic female supervisor, Iris Rodriguez, in May 2010, (Gelin Dep. at 102-03); (3) Nashak testified that he advocated termination rather than demotion as the appropriate sanction for Gelin's misconduct, (Nashak Dep. at 119); and (4) during the EEU investigation, her office was allegedly broken into and medical documentation that would have legitimized Wandaliz Rodriguez's leave was stolen, (Gelin Dep. at 205).  (Pl. Mem. in Opp. at 18-19.)

To the extent that Gelin cites the May 2010 meeting as part of her claim of hostile work environment, it is hardly compelling. Gelin's own deposition testimony indicates that at that meeting, Nashak raised his voice at Iris Rodriguez in particular rather than at her.  (Gelin Dep. at 102-03.)  It is also unclear to the Court how a recommendation of termination as a sanction for misconduct supports a claim of hostile work environment. And even crediting Gelin's deposition testimony that documentation was stolen from her office and that she was laughed at and taunted after her demotion, her hostile work environment claims fail for precisely the same reason her discrimination and retaliation claims failed: she has not shown that any such behavior was motivated by discriminatory or retaliatory animus.  In an apparent attempt to tie her allegations of harassment to her race and gender, Gelin argues that she made two prior complaints while employed at DHS and that neither received formal action.  (Pl. Mem. in Opp. at 18-19.) She contends that on one occasion during 2003 or 2004, she complained to the EOA that a Caucasian

employee called her a "black bitch," and that on a separate occasion when Gelin worked at DHS's Bronx offices prior to her 2005 transfer to AFIC, she reported to her supervisor that she was sexually harassed by a fraud investigator who threatened to follow her home.  (*Id.*; Gelin Dep. at 180-84.)  These two prior incidents do not suffice to establish that any of the alleged acts of harassment from 2008-10 were motivated by discrimination.  Furthermore, these isolated incidents cannot themselves support a claim of hostile work environment under the federal statutes, *Fincher*, 604 F.3d at 724, and any potential claim of harassment under the NYSHRL would be time-barred under the three-year limitations period applicable to claims under that statute.  *See* C.P.L.R. § 214(2); *Odom v. Doar*, 497 F. App'x 88, 89 (2d Cir. 2012) (summary order).  Gelin has failed to establish that she suffered a hostile work environment because of her race, color, gender, or participation in any protected activity.  Summary judgment is appropriate.

*IV. NYCHRL Claims*

Although for years the Second Circuit construed the NYCHRL "to be coextensive with its federal and state counterparts," amendments to that statute in 2005 require federal courts to analyze such claims "separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux N. America, Inc.*, --F.3d--, 2013 WL 1776643, at *4-5 (2d Cir. Apr. 26, 2013).  This is because the amendments to the NYCHRL require that it "be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof," regardless of whether comparable federal and state claims fail.  *Id.* at *5 (quoting N.Y.C. Admin. Code § 8-130); *Williams v. New York City Housing Auth.*, 872 N.Y.S.2d 27, 36-37 (1st Dep't 2009). Despite the NYCHRL's broad construction, however, "district courts may still grant summary judgment with respect to NYCHRL claims if there is no genuine dispute as to any material fact." *Mihalik*, 2013 WL 1776643 at *6.

The NYCHL does not differentiate between hostile work environment claims and discrimination claims; rather, both are governed by New York City Administrative Code § 8-107(1)(a).  This provision makes it "an unlawful discriminatory practice…[f]or an employer or an employee or agent thereof…to discriminate against [a] person in compensation or in terms, conditions or privileges of employment" based on actual or perceived membership in a protected group.  N.Y.C. Admin. Code § 8-107(1)(a); *Williams*, 872 N.Y.S.2d at 37 (noting that there is no separate harassment provision in the NYCHRL); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 261 (E.D.N.Y. 2012) ("Hostile work environment claims are analyzed under the same provision of the NYCHRL as discrimination claims.").

The proper inquiry under the NYCHRL is whether "the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her [race, color or] gender." *Williams*, 872 N.Y.S.2d at 39.  Because the law is designed to "make sure that discrimination plays *no* role" in the workplace," "questions of 'severity' and 'pervasiveness' are applicable to consideration of the scope of permissible damages, but not to the question of underlying liability." *Williams*, 872 N.Y.S.2d at 38 (emphasis in original); *see also Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259, 264 (2d Dep't 2011) (adopting the *Williams* standard). "When applying this standard, however, district courts must be mindful that the NYCHRL is not a 'general civility code'" and "[t]he plaintiff still bears the burden of showing that the conduct is caused by a discriminatory motive."  *Mihalik*, 2013 WL 1776643 at *6 (quoting *Williams*, 872 N.Y.S.2d at 40-41).  Thus, "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss.  She must show that she has been treated less well at least in part '*because of* her [race, color, or] gender.'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 39, 40 n. 27) (emphasis added in *Mihalik*). The employer also may assert as an affirmative defense that "the

conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider 'petty slights and trivial inconveniences.'" *Id.* (quoting *Williams*, 872 N.Y.S.2d at 41). In such "truly insubstantial cases, where the defense is clear as a matter of law," summary judgment may be appropriate. *Id.* (quotation marks omitted). In evaluating these claims, the court must consider the "totality of the circumstances." *Id.* (quotation marks omitted).

The standard for a claim of retaliation under the NYCHRL is also broader than its federal and state counterparts because retaliation "in any manner" is prohibited and the plaintiff need not establish that she suffered "an ultimate action with respect to employment…or [] a materially adverse change in the terms and conditions of employment" as a result of engaging in protected activity. N.Y.C. Admin. Code § 8-107(7); *Fincher*, 604 F.3d at 723 (quoting *Williams*, 872 N.Y.S.2d at 34). Rather, the plaintiff must "show that she took an action opposing her employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action." *Mihalik*, 2013 WL 1776643 at *7 (internal citations omitted). As with claims of discrimination under the NYCHRL, summary judgment is appropriate if "the plaintiff fails to prove that the conduct is caused at least in part by…retaliatory motives." *Id.* at *7.

Even under the more lenient NYCHRL standards, Gelin's complaint fails. She has not offered any evidence establishing that she was treated less well because of her race, color or gender or because she took action opposing discriminatory practices, either because those practices were not discriminatory or because there was no causal connection between her complaint and the defendant's actions.[11] Summary judgment on Gelin's NYCHRL claims is granted.

---

[11] As with the NYSHRL, the NYCHRL applies a three-year statute of limitations. N.Y.C. Admin. Code § 8-502(d). Thus, her allegations that a Caucasian employee called her a "black bitch" sometime in 2003 or 2004 and that she

**CONCLUSION**

For the reasons stated, the motion for summary judgment is granted as to all claims and defendants. The Clerk of Court is directed to enter judgment accordingly and to close this case.

SO ORDERED.

Dated:  May 24, 2013
      Brooklyn, N.Y.

                                          _____/s/_____
                                          Carol Bagley Amon
                                          Chief United States District Judge

---

was sexually harassed at some point prior to her 2005 transfer to AFIC are not independently actionable under the NYCHRL because they are time barred. Moreover, as previously noted, these two prior incidents do not suffice to establish that any of the alleged acts of harassment from 2008-10 were motivated by discrimination. (Gelin Dep. at 180-84.) *See Odom*, 497 F. App'x at 89.